**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 2:16CR0222- 001 |
| AARON DANIELS, | : | JUDGE SARGUS |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF DEFENDANT AARON DANIELS**

Now comes the Defendant, AARON DANIELS, by and through counsel, and hereby submits this sentencing memorandum for the Court's consideration in sentencing.

Mr. Daniels submits that an appropriate sentence in this case would be in the range of two years with credit for time served and a five-year term of supervised release. This sentence would take into account Mr. Daniels's good character, his lack of criminal record, his pleading guilty and taking responsibility for his actions, his youthfulness and fragile mental state at the time he participated in the offense, the seriousness of the offense, and the sentences of similar defendants.

By way of brief background, Mr. Daniels pled guilty to Count Two of the Indictment before this Court on July 7, 2017, pursuant to a plea agreement. There is no mandatory minimum in the case and the statutory maximum sentence is 25 years (pursuant to the charge under 18 U.S.C. § 2339 B), and the parties agreed to a Statement of Facts, as well as stipulations relating to the applicable guideline provisions. The guideline stipulations are not binding on the court. There are several defendant specific factors that the court must consider pursuant to 18 U.S.C. § 3553(a) mitigate in favor of a substantial downward variance. Counsel requests the Court to use its broad discretion in fashioning a just sentence in this case.

**Good character**

Mr. Daniels was raised by a very good family. He attended Columbus Alternative School until he began experiencing mental health issues that caused him miss many days from school and to fall behind. Mr. Daniels' school record did not show expulsions, suspensions or any other type of disciplinary issues. According to the PSR, Mr. Daniels' mother described him as a respectful and talkative child. He was a good student who had problems with focus. Mr. Daniels lack of criminal history demonstrate that he has been a non-violent member of the Columbus community. His exposure to Islam as a youngster came from his contact with Muslim friends. He began attending a local mosque as a teenager, which led to his conversion. He began to study the Koran and it increased his interest in becoming a scholar. After his conversion he began trying to get a scholarship to study Islam in the Middle East. It was this desire to study that led to him seeking assistance online.

Mr. Daniels is a very gentle person, shy but good spirited, kind, attentive, and helpful to others. He expressed none of the traits that one would expect to find in a person facing such serious charges. It goes without saying that Mr. Daniels has no previous convictions for any criminal conduct. In fact, he had not been in trouble for anything in his life. Improper behavior of any sort was entirely contrary to his good character and kind intentions. Mr. Daniels was on a good path until he began suffering from the undiagnosed effects of schizoaffective disorder. His mother, Adrienne Daniels, noticed the changes in his behavior and tried to get him to seek medical treatment. Unfortunately, Mr. Daniels resisted his mother's suggestion and his mental condition deteriorated.

**I.     Mr. Daniel's mental condition was compromised during the time he communicated with ISIL and provided financial support.**

Mr. Daniels was suffering with schizophrenia at the time he began communicating with individuals online. Aaron's mother, Adrienne Daniels, confirmed during the interview with Dr. Daniel Davis that her family has a history of schizophrenia. Her brother was diagnosed with the disease as a young adult. When Aaron began to act in strange ways during his late teens, she suspected that he might also be suffering with the disease. His mother described the deterioration in his mental state and how she tried to convince him to seek psychiatric help. She described episodes when Aaron was talking to people who were not present and laughing out loud without any reason. Two separate psychologists evaluated Mr. Daniels. Based on his reported family history, interviews with his mother and their independent testing, they diagnosed him to be suffering from a mental illness. They both concluded that mental illness contributed to his participation in the events that form the basis for his charges.

Dr. Daniel Davis did the first evaluation of Mr. Daniels at the Franklin County Correctional Center. He administered several psychological tests and conducted extensive interviews with Mr. Daniels and his mother. Based on the psychological test results and the family history he uncovered during his interviews, Dr. Davis concluded that Mr. Daniels was suffering from a serious mental illness, schizoaffective disorder. He further concluded that Mr. Daniels "was extremely vulnerable to negative psychological manipulation, coercion influence by others whom he perceived to have certain authority and status. This contributed to his actions in this case. Dr. Daniels recommended intensive mental health treatment.

After Dr. Daniels evaluation was provided to the government, they requested the court to appoint a psychologist to conduct an independent examination/evaluation of Mr. Daniels. The

3

court appointed Dr. Kara Predmore to conduct the independent evaluation. After being provided with requested case materials, including the evaluation and report completed by Dr. Daniel Davis, Dr. Predmore confirmed his diagnosis of schizoaffective disorder. Dr. Predmore's evaluation and conclusions addressing his compromised mental condition at the time he engaged in this conduct is instructive:

> The summation of the evaluation indicated there is an abundance of evidence that in an around the time of the criminal conduct, the defendants thoughts, perception and behaviors were impaired as a result of symptoms of mental illness. For instance there is evidence that irrational thoughts and experience of auditory and visual hallucinations were connected to problems with concentration and social withdrawal.

(PSR p. 14 para. 69).

Mr. Daniels has taken responsibility for his actions in this case. His interactions with the ISIL operative were exclusively through the internet and he was unable to provide information or cooperation that could assist the government in order to further their terrorism investigations. He spoke with agents on the day he was arrested, and after first denying any involvement, he admitted his online activities. After getting mental health treatment and being prescribed medications to help with his mental illness, Mr. Daniels completely retracted from the views that led him to this offense.

## II. Seriousness of offense and sentences in similar cases

Obviously, the offenses charged in this case are serious. Mr. Daniels efforts to connect with and assist those engaged in terrorist propaganda and actions is uncharacteristic. Mr. Daniels began his communications in an effort to get sponsorship so that he could study Islam and further his goal of becoming an Islamic scholar. Unfortunately, that pure intention was exploited by individuals seeking to recruit and radicalize young American Muslims to join forces with their

terroristic efforts. They exploited his fragile mental state and corrupted his desire to serve Islam in a heroic way. He is eternally sorry and ashamed that he participated in the planning of these acts, and cannot to this day believe that he let it get as far as it did.

There is little precedent in this district in terms of comparable cases for determining the relative seriousness of the conduct involved in Mr. Daniels's case. The best comparisons are cases from the Northern District of Ohio related to a plan to detonate a weapon of mass destruction. In United States v. Wright, et. al., 1:12CR0238 (N.D. Oh.), the defendants were a terrorist cell in the Cleveland area who conspired to attack financial institutions, bridges, and police in the Cleveland area. In carrying out their plans, the conspirators prepared over several months to blow up a bridge. The defendants purchased what they believed were explosives from an informant and actually placed the explosives at the base of the Route 82 Bridge outside Cleveland. The defendants then attempted to blow the bridge up with a detonator accessed via cellular phones. Thus, the defendants took all actions necessary to commit an act of terrorism through detonating a weapon of mass destruction, only to be foiled because they mistakenly had been given fake explosives. One defendant – Stafford – was convicted after trial and the remaining four defendants pled guilty. The above facts were taken from the Sixth Circuit's decision on Stafford's appeal, United States v. Stafford, 782 F.3d 786 (6th Cir. 2015).

Defendant Stafford, who went to trial, received a sentence of 10 years. The remaining defendants who pled guilty received sentences of 11.5 years, 9.75 years, 8 years and 1 month, and 6.75 years. Thus, the average sentence for the defendants in the terror cell was about 9.25 years. This for defendants who pulled the trigger to detonate a weapon of mass destruction and which would have killed an untold amount of people.

Other similar defendants from district courts around the country have received or are receiving sentences in this range. For example, in <u>United States v. Khan</u>, 1:14CR564 (N.D. Ill), the defendant was convicted of attempting to provide material support to ISIS. In the case, the defendant attempted to travel overseas to fight for ISIS, and attempted to bring his two minor siblings with him, knowing it would likely mean their death. At the sentencing, Judge John J. Tharp, Jr., sentenced Mr. Khan to forty months (3 years and 4 months) imprisonment in the BOP with 20 years of supervised release, a sentence consistent with request made by defense counsel in a sentencing memorandum filed with the court.

Likewise, in <u>United States v. Conley</u>, 14CR0163 (D. Col.), a case with very similar facts to Mr. Daniel's case, the defendant was convicted for participating in a conspiracy to provide material support to ISIS. In the case, the defendant was connected directly with an ISIS operative in Syria, Yousr Mouelhi, with a goal toward joining and fighting for ISIS. Based on this connection, the defendant agreed to join the U.S. Army Explorers to be trained in U.S. military tactics and in firearms in order to learn to fight for ISIS. Soon thereafter, the defendant attempted to travel to Turkey to join Mouelhi and ISIS, and the defendant was arrested. <u>Conley</u>, 14CR0163 (R. 37, Plea Agreement and Statement of Facts, 9/10/14)). For this conduct, the defendant received a sentence from the district court in Denver of 4 years imprisonment and 3 years supervised release. The court's sentence was based in part on significant evidence that the defendant, Ms. Conley was suffering from mental illness at the time she engaged in the criminal conduct. The court also ordered several special conditions of supervised release, including mental health treatment, medication compliance, limited access to the internet and no contact with terrorist organizations, and that she not obtain or possess any passport or international travel documents. <u>Conley</u>, 14CR0163 (R. 78, Sentencing Hearing, Courtroom Minutes, 1/23/15)).

In two similar cases out of Texas, two defendants were charged with attempting to provide and conspiracy to provide material support to ISIS, United States v. Wolfe, 1:14CR213 (W.D. Tex.) and United States v. Khan, 1:14CR0212 (W.D. Tex.). The defendants received sentences of 6.75 years and 10 years imprisonment respectively.

In other cases from Virginia, Mississippi, and California, defendants received similar sentences for supporting terrorism. United States v. Farrokh, 1:16CR020 (E.D. Va.)(8.5 years imprisonment); United States v. Teausant, 2:14CR087 (E.D. Cal.)(12 years imprisonment); United States v. Dakhlalla and United States v. Young, 1:15CR098 (N.D. Miss.)(8 years and 12 years imprisonment); United States v. Dandach, 8:14CR109 (C.D. Cal.)(15 years).

Admittedly, in some districts, higher sentences have been imposed for terrorism related cases, however, these higher sentences have generally been reserved for defendants with prior criminal records before the terrorism offense. For example, in United States v. Morgan, 1:14CR0414 and 1:14CR194 (M.D.N.C.), the defendant was convicted of providing material support to ISIS and possessing an assault rifle as a convicted felon. The defendant's prior felony conviction was for shooting into a habitation. Morgan, 1:14CR194 (R. 12, Statement of Factual Basis, 10/30/14)). The North Carolina district court imposed a combined sentence of 20.25 years.

Similarly, in United States v. Khalifi, 1:12CR037 (E.D. Va.), the defendant was convicted of attempting to use a weapon of mass destruction against the U.S. Capitol. The defendant's prior record involved multiple offenses from several jurisdictions including drug offenses and two assault convictions. Khalifi, 1:12CR037 (R. 31, Position Paper of Government for Sentencing, 9/7/12)). Additionally, the defendant was an illegal alien in the United States. Id. (R. 42, Order of Removal, 9/14/12)). The district court in Virginia imposed a sentence of 30 years.

7

Likewise, in United States v. Finton, 3:10CR30215 (S.D. Ill.), the defendant was convicted of attempting to use a weapon of mass destruction at a federal building. The defendant's prior record included a lengthy prison sentence for armed robbery and aggravated assault. The Illinois district court imposed an agreed sentence of 28 years imprisonment.

In United States v. Davis, 1:15CR059 (S.D. Ga.), the defendant was convicted of attempting to provide material support to ISIS. At the time of the federal offense, the defendant was on parole for a prior offense, for which he was arrested. The district court in Georgia imposed a sentence of 15 years in prison.

The table below provides a thumb nail summary of all of the cases referenced above.

| Name/Case # | Location | Charge | Sentence | Prior Record |
|---|---|---|---|---|
| **Joshua Stafford** 1:12-cr-0238; U.S. v. Stafford, 13-4188 (6th Cir.) | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **10 years** | |
| **Douglas Wright** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **11.5 years** | |
| **Brandon Baxter** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **9.75 years** | |
| **Connor Stevens** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **8 years, 1 month** | |
| **Anthony Hayne** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **6.75 years** | |
| **Mohammed Hamzah Khan**, 1:14-cr-00564 | Chicago, ND Illinois | Attempt to provide material support to ISIS | **5 years** | |
| **Shannon Conley**, 1:14-cr-00163 | Denver, D. Colo. | Conspiracy to provide material support to ISIS | **4 years** | |

8

| | | | | |
|---|---|---|---|---|
| **Michael Todd Wolfe** 1:14-cr-00213 | W.D. Tex. | Attempting to provide material support ISIS | **6.75 years** | |
| **Rahatul Ashikim Khan**, 1:14-cr-00212 | W.D. Tex. | Conspiracy to provide material support to ISIS | **10 years** | |
| **Joseph Hassan Farrokh**, 1:16-cr-00020 | E.D. Va. | Attempting to provide material support to ISIS | **8.5 years** | |
| **Nicholas Michael Teausant**, 2:14CR087 | E.D. Cal. | Attempting to provide material support to ISIS | **12 years** | |
| **Muhammad Dakhlalla** and **Jaelyn Young** 1:15CR00098 | N.D. Miss. | Attempting and conspiring to knowingly provide material support to ISIS | **8 years** and **12 years** | |
| **Adam Dandach**, 8:14CR00109 | C.D. Cal. | Material support to ISIS | **15 years** | |
| **Donald Morgan**, 1:14-cr-00414; 1:14cr194 | M.D.N.C. | Attempt to provide material support to ISIS; possession of firearm (assault rifle) by convicted felon | **20.25 years** | Prior felony for shooting into a habitation |
| **Amine El Khalifi**, 1:12-cr-00037 | E.D. Va. | Attempting to use weapon of mass destruction against U.S. Capitol | **30 years** | Prior offenses from several jurisdiction including drug offenses and two prior assault convictions |
| **Michael Finton**, 3:10-cr-30215 | S.D. Illinois | Attempted use of weapon of mass destruction | **28 years** | Prior lengthy prison sentence for armed robbery and aggravated assault |
| **Leon Davis**, 1:15-cr-00059 | S.D. Ga. | Attempt to provide material support to ISIS | **15 years** | On parole at time of offense |

9

In comparing Mr. Daniels to the above cases, it seems that a sentence in the range of two years is reasonable. He certainly didn't get as far along in the commission of the offense as the defendants in the terrorist cell in the Cleveland who completed all of the necessary acts to detonate a bomb on a bridge, which would have killed countless individuals and caused a massive panic in the Cleveland area. Yet these defendants, one of whom went to trial, received an average sentence in the 9.25 year range. Moreover, it appears that the Cleveland terror cell defendants did the lion's share of their planning before coming into contact with the FBI informant, while Mr. Daniels was under the influence of the FBI informant for months before eventually agreeing to provide funds for the informant.

In terms of relative culpability, Mr. Daniels is likely most akin to the defendants in <u>Khan</u> out of N.D. Illinois and <u>Conley</u> out of the District of Colorado. The defendant in <u>Khan</u> planned to travel to fight and die for ISIS, and planned to bring his two minor siblings along for the ride, and the defendant in <u>Conley</u> was in contact with an ISIS operative and joined the U.S. Army explorers to be trained in U.S. military tactics and firearms to fight for ISIS as needed. These defendants are in the 4-5 years range in terms of sentences.

Mr. Daniels engaged for months on Facebook and other social media platforms, and after being pressured by his contact to show that he was serious, gradually slid into a plan to travel to join ISIS. He had the misfortune of actually coming into contact with an individual from ISIS who gave him some explicit and particular suggestions on acts he could carry out for ISIS. When the government realized that Mr. Daniels was planning to actually travel to join ISIS, it sent the FBI informant to engage with him.

The influence that both the ISIS contact, and the FBI informant, had over Mr. Daniels' decision making process was increased by his compromised mental condition. The Court should

10

consider and give great weight to the observations and conclusions of both Dr. Daniel Davis and Dr. Kara Predmore in determining what sentence is appropriate as well as what treatment should be provided during any term of incarceration. The court can also use their recommendations in deciding what special conditions should be imposed during his term of supervised release.

### III. Terrorist online propaganda has ensnared other immature and disillusioned young Americans

Attempting to provide material support by providing personnel in the form of one's own body to a designated foreign terrorist organization, which has now become the scourge of the earth to Western civilization, is certainly serious; and a very serious problem for U.S. national security purposes. It has also now become a problem for domestic law enforcement. But the nature of this problem, and how to resolve it, depends upon whether one views the issue from a national security standpoint or from a domestic law enforcement standpoint.[1] It is an alarming, yet not unprecedented historical phenomena that an American citizen would choose to leave his country to join a foreign civil war.[2] Nor is terrorism limited only to post 9/11 America, and

---

[1] Counsel would submit that the foreign policy issue regarding the serious danger of ISIS on a global scale and the domestic policy issues concerning ISIS recruitment or brainwashing of susceptible American youth are antithetical to one another. But, counsel would daresay that this is a byproduct of the attempt to shoehorn foreign policy matters into domestic criminal prosecutions. *See, e.g.*, Thomas Anthony Durkin, *Permanent States of Exception: A Two-Tired System of Criminal Justice Courtesy of the Double Government Wars on Crime, Drugs & Terror*, Val. U. L. Rev., Vol. 50, No. 2 (2016). Without elaborating a far more complicated topic, or attempting to minimize Defendant's conduct, this too, is the consequence of the political decision after 9/11 to treat terrorism on the "war" model versus the "criminal" model. *See, e.g.*, James B. Steinberg and Miriam R. Estrin, *Harmonizing Policy and Principle: A Hybrid Model for Counterterrorism*, 7 J. Nat'l Security L. & Pol'y 161.

[2] *See*, Joshua E. Keating, *Is It Legal for Americans to Fight in Another Country's Army?* FOREIGN POLICY, September 2, 2011 ("The U.S. government certainly doesn't encourage citizens to go off and fight in foreign wars, but there's a long history of it—from the Abraham Lincoln Brigade that fought against Francisco Franco during the Spanish Civil War to the many Jewish Americans who have served in the Israel Defense Forces."). The famous French Foreign Legion also comes to mind.

11

fundamentalist Islamic groups.[3]

However, the circumstances of Defendant's admitted conduct and how he came to commit this offense provides needed social and political context that—while not excusing the conduct—both mitigates and explains this behavior. In particular, the recruitment of Mr. Daniels by savvy ISIL recruiters using persuasive propaganda on social media to capitalize on his susceptibility to this messaging, played a very significant role in the commission of this offense. Moreover, as set forth in detail below, the sympathy Mr. Daniels felt for the Syrian children massacred by Assad's regime, his religious motivations to make *hijrah* to ISIL's self-proclaimed caliphate,[4] his perceived opportunity to participate in the creation of the so-called utopian Islamic society, and the search for belonging and identity all played a crucial role in his decision. *See, Case by Case: ISIS Prosecutions in the United States*, Center On National Security at Fordham Law, March 1, 2014 – June 30, 2016, http://news.fordham.edu/law/center-on-national-security-releases-report-on-isis-prosecutions/ ("Overall, there is a sense of identity crises and alienation from society across the wide range of [ISIS] cases.").

ISIS' powerful ability to recruit American youth on social media is by now a well-documented phenomenon. *See, e.g*., Lorenzo Vidino and Seamus Hughes, *ISIS in America: From Retweets to Raqqa*, Program on Extremism, The George Washington University (December 2015) ("U.S. authorities estimate that several thousand Americans consume ISIS propaganda online creating what has been described as a 'radicalization echo chamber.'"); Testimony of

---

[3] Daniel Deudney, *Omniviolence, Arms Control, and Limited Government,* THE LIMITS OF CONSTITUTIONAL DEMOCRACY, Princeton University Press (2010) ("The recent focus on violent fundamentalist Islamic groups operating in many parts of the world has been appropriate but should not obscure the fact that the world is filled with other groups with revolutionary, if not apocalyptic, goals…. Terrorism in something like its current form has been around for at least a century.") ch. 15, p. 311.
[4] *Hijra* refers to the Islamic teaching of mandatory emigration to the caliphate. *Encyclopedia Britannica* https://www.britannica.com/event/Hijrah-Islam.

12

James B. Comey, Director, Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, *Counterterrorism, Counterintelligence, and the Challenges of "Going Dark,"* July 8, 2015 ("Social media has allowed groups, such as ISIL, to use the Internet to spot and assess potential recruits. With the widespread horizontal distribution of social media, terrorists can identify vulnerable individuals of all ages in the United States—spot, assess, recruit, and radicalize—either to travel or to conduct a homeland attack.");[5] *see also,* , (ISIS' ultra-slick online magazine *Dabiq*).

Such high minded purpose has been identified as a common factor among ISIL recruits, and is certainly in keeping with teenagers seeking a more meaningful solution to their identity problems. As noted by Lorenzo Vidino and Seamus Hughes, "In many cases examined by our research team [the Program on Extremism at George Washington University], an underlying sense of sympathy and compassion appeared to play an important role in initially motivating young Americans to become interested and invested in the Syrian conflict." *ISIS in America: From Retweets to Raqqa*, THE GEORGE WASHINGTON UNIVERSITY (2015) p. 15. *See also*, Testimony of Peter Bergen, Director, International Security Program, New America and Profession of Practice at Arizona State University, U.S. Senate Committee on Homeland Security and Governmental Affairs, *Jihad 2.0: Social Media in the Next Evolution of Terrorist Recruitment*, May 7, 2015 ("In the minds of ISIS' recruits, the group is doing something that is of *cosmic importance* that is sanctioned by Allah: defending Sunni Muslim civilians from the terrible onslaughts of the Assad regime, which has not hesitated to use chemical weapons in its war against its own people.")(emphasis in original).

---

[5] There is no evidence whatsoever to indicate that Mr. Daniels ever intended to commit a violent act of any kind in the United States. Counsel submits that due consideration of this factor is critical, for it distinguishes Mr. Daniels from many other defendants charged under § 2339B who have received harsh sentences under the guidelines.

13

Finally, it should not go unmentioned that, at the time of his arrest, Mr. Daniels was only nineteen (19) years-old and that this was a process of indoctrination that began when he, too, was a minor. While Daniels was not legally a minor at the time of the flight, this factor should weigh heavily in his favor. In *Miller*, the Supreme Court articulately delineated several of the important differences between juvenile and adult offenders, which is quite poignant to this discussion:

> [C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, [] they are less deserving of the most severe punishments… First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to a recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adults'; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012)(internal quotations omitted)(holding mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment).

Counsel submits that these important considerations apply in equal force to a young Mr. Daniels, who with insufficient critical thinking skills was extremely vulnerable to the negative and ubiquitous influence of social media. Compounding that negative influence, Mr. Daniels limited cultural environment and isolation brought on by mental illness likely exacerbated the problem. Even more to the point, the mental health treatment and education urged by counsel strike at the very core of the Supreme Court's reasoning in *Miller*; that is, Mr. Daniels' ideas are less fixed at a young age than an older adult—and he is therefore far more likely to be able to be reformed with mental health treatment, education, and therapy as a consequence.

Furthermore, and equally to the point, this approach is consistent with President Obama's

pledge to "offer an alternative vision" to the American youth who have fallen prey to ISIS' social media propaganda machine.[6] That is, counsel strongly suggests that this Court consider the overwhelming need for Mr. Daniels' sentence to reflect a coherent, effective response to the very real practical problem of American children attempting to join ISIS that is consistent with the CVE positions articulated by the federal government including the White House and Department of Justice.

In August 2011, President Obama signed the *National Strategy for Empowering Local Partners to prevent Violent Extremism in the United States* ("National Strategy"), which outlines a community-based approach to preventing violent extremists from inspiring, radicalizing and recruiting individuals in the United States.[7] The National Strategy includes the provision that the government strive to use a wide range of good governance programs including those that provide "social services" to prevent and address radicalization. *Id*. at 8. A few months later, in December of 2011, the White House released its *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States* ("Strategic Implementation Plan"), in an effort to form a coherent method to implement the National Strategy.[8] The Strategic Implementation Plan identifies three priority areas of action: (1) enhancing Federal engagement

---

[6] Remarks by President Obama in Address to the United Nations, UN General, September 24, 2014, https://www.whitehouse.gov/the-press-office/2014/09/24/remarks-president-obama-address-united-nations-general-assembly.

[7] Office of the President of the United States, *Empowering Local Partners to Prevent Violent Extremism in the United States*, August 2011, https://www.whitehouse.gov/sites/default/files/empowering_local_partners.pdf ("Communities are best placed to recognize and confront the threat [of radical ideology] because violent extremists are targeting their children, families, and neighbors. Rather than blame particular communities, it is essential that we find ways to help them protect themselves. To do so, we must continue to ensure that all Americans understand that they are an essential part of our civic life and partners in our efforts to combat violent extremist ideologies and organizations that seek to weaken our society.").

[8] Office of the President of the United States, *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States*, December 2011, https://www.whitehouse.gov/sites/default/files/sip-final.pdf

with and support to local communities that may be targeted by violent extremists;[9] (2) building government and law enforcement expertise for preventing violent extremism; and (3) countering violent extremism propaganda while promoting our ideals. *Id*. The Strategic Implementation Plan tasks various federal agencies including the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, the State Department, and others with executing various CVE policies and programs.

On September 15, 2014, former Attorney General Eric Holder announced the DOJ's *Pilot Program to Counter Violent Extremists (*"DOJ Pilot Program").[10] In announcing the DOJ Pilot Program, Holder stated that the program seeks to "bring together community representatives, public safety officials, religious leaders, and United States Attorneys to improve local engagement; counter violent extremism; and—ultimately—to build a broad network of community partnerships to keep our nation safe." *Id*. Programs were subsequently launched in Boston, Los Angeles and Minneapolis.[11]

A few days later, on September 24, 2014, President Obama gave his speech at the United Nations imploring the international community to steps to "contest the space that terrorists

---

[9] The government's effort to enhance community outreach is not uncontroversial. The directive been criticized as a vehicle to exploit the communities for intelligence purposes. *See, Countering Violent Extremism (CVE): A Resource Page*, BRENNAN CENTER FOR JUSTICE, October 5, 2016, https://www.brennancenter.org/analysis/cve-programs-resource-page (collecting articles regarding the exploitation of community outreach for intelligence purposes).

[10] Department of Justice, *Attorney General Holder Announces Pilot Program to Counter Violent Extremists*, September 15, 2014, https://www.justice.gov/opa/pr/attorney-general-holder-announces-pilot-program-counter-violent-extremists

[11] *See*, US Attorney's Office, District of Massachusetts, *A Framework for Prevention and Intervention Strategies*, February 2015, https://www.justice.gov/sites/default/files/usao-ma/pages/attachments/2015/02/18/framework .pdf (developed by a collaborative of non-governmental and governmental stakeholders from the Greater Boston region); *The Los Angeles Framework for Countering Violent Extremism*, February 2015, https://www.dhs.gov/sites/default/files/publications/Los%20Angeles%20Framework%20for%20CVE-Full%20Report.pdf (developed by the Los Angeles Interagency Coordination Group in Collaboration with Community Stakeholders); *Building Community Resilience, Minneapolis-St. Paul Pilot Program, A Community-Led Local Framework*, February 2015, https://www.justice.gov/usao-mn/file/642121/download.

occupy, including the Internet and social media," noting that ISIL "propaganda" "has coerced young people to travel abroad to fight their wars, and turned students—young people full of potential—into suicide bombers. We must offer an alternative vision."[12]

To that end, in February of 2015, President Obama held *The White House Summit on Countering Violent Extremism*, which announced new steps to advance CVE efforts including appointing a full-time CVE Coordinator at the Department of Homeland Security, seeking additional funding to support DOJ CVE efforts, and establishing various domestic and international collaborative partnerships.[13] Later that same year, in September of 2015, the President again hosted a White House event focused on CVE—the *Leader's Summit on Countering ISIL and Violent Extremism*.[14] That same month, the Department of Justice launched another initiative focused on the CVE, the *Strong Cities Network to Strengthen Community Resilience Against Violent Extremism*.[15] A sentence which would allow Mr. Daniels to both attain CVE and mental health treatment and further his education would appear to counsel to comport with the National Strategy and the ongoing efforts of the federal government to address this issue.

For all the reasons set forth above, counsel would implore the Court to fashion a sentence that is tempered with mercy, which would further demonstrate to Mr. Daniels that this a country that believes in fairness and redemption. His is a life well worth saving, and Mr. Daniels needs desperately to complete his education if he is to succeed. Years in college, versus years in prison is what hangs in the balance. It is the right thing to do.

---

[12] *See* footnote 18, *supra*.
[13] https://www.whitehouse.gov/the-press-office/2015/02/18/fact-sheet-white-house-summit-countering-violent-extremism
[14] https://www.whitehouse.gov/the-press-office/2015/09/29/leaders-summit-countering-isil-and-violent-extremism
[15] https://www.justice.gov/opa/pr/launch-strong-cities-network-strengthen-community-resilience-against-violent-extremism

### IV. The Court can and should consider Mr. Daniels' mental condition in fashioning a sentence

Congress has mandated that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The reports prepared by Dr. Davis and Dr. Predmore are based on an extremely detailed analysis of Mr. Daniels including psychological testing, interviews with Mr. Daniels, interviews of his mother, and a painstaking review of all of the evidence the government disclosed to the defense in this case. Most importantly, the doctors reviewed the conversations between the informant and Mr. Daniels, and provided an in depth examination of their relationship and rendered conclusions based on extensive citation to the record. Their reports are highly relevant and extremely useful in analyzing important factors under 18 U.S.C. § 3553 such as the nature and circumstances of the offense, the need for mental health treatment, the need for just punishment, and the need to protect the public from further crimes of the defendant.

Each of these factors weigh heavily in favor of a substantially reduced sentence from the applicable advisory guideline range. These factors speak to the question of whether the defendant will be a risk to the community of committing future crime based on the nature of the present crime and his future risk of recidivism. Guiding this analysis is first the fact that Mr. Daniels has never done anything wrong in his life. He has been a model student and citizen. His potential future dangerousness is an issue the Court must consider, but his history of nonviolence, coupled with the improvements in his mental condition since receiving treatment in the lock-up, shows that there are therapeutic interventions available to the court to address and reduce the likelihood of his involvement in similar conduct in the factors.

After a careful analysis of Mr. Daniels and the factors that led him to commit these crimes, both doctors concluded that his compromised mental condition contributed to him being influenced to participate in this crime. With CVE, mental health treatment and appropriate medications to treat his mental illness, it is unlikely Mr. Daniels will reoffend in this type of crime. Counsel requests that the Court take into consideration the detailed reports and examinations of Mr. Daniels, including their treatment recommendations in formulating the appropriate sentence in this matter.

**Conclusion**

In sum, Mr. Daniels submits that the statutory maximum sentence of 240 months recommended by U.S. Probation Officer in the presentence report is excessive and inconsistent with the goals of sentencing set forth in 18 USC §3553(a). Counsel asserts that an appropriate sentence in this case is in the range of two years imprisonment and five years of supervised release. This adequately accounts for the factors under § 3553, including Mr. Daniels' seriously compromised mental condition at the time he engaged in the criminal conduct, and the sentences of similarly situated defendants in similar cases.

Respectfully submitted,

*s/ George Chaney, Jr.*
George Chaney, Jr. ( LA 22215)
Assistant Federal Public Defender
10 W. Broad Street, Suite 1000
Columbus, Ohio 43215
(614) 469-2999
Attorney for Defendant, Aaron Daniels

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing was served upon Jessica Knight, Assistant United States Attorney, via Electronic Case Filing, on this day of filing.

                                      *s/ George Chaney, Jr.*
                                      George Chaney, Jr.