## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 2:16-cr-222 |
| | : | |
| Plaintiff, | : | CHIEF JUDGE SARGUS, JR. |
| | : | |
| v. | : | |
| | : | **GOVERNMENT'S SENTENCING** |
| | : | **MEMORANDUM** |
| AARON T. DANIELS, | : | |
| a/k/a "Harun Muhammad," | : | |
| a/k/a "Abu Yusuf," | : | |
| | | |
| Defendant. | | |

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Defendant Aaron T. Daniels ("Defendant" or "Daniels").

### I.     Introduction

At the outset, the United States notes the unique danger that terrorism poses to our country. As noted by the Second Circuit Court of Appeals, because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal "terrorists *and their supporters* should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis supplied). The court further noted that, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Id*. This legal principle should govern the sentence to be imposed on Defendant, who although having no prior convictions, is a distinct danger to the public by virtue of his admitted support of the Islamic State of Iraq and al-Sham (ISIS).

1

However, the United States recognizes that Defendant may be suffering from a psychological disorder.  Likewise, the evidence also supports a finding that Daniels may be manipulating the sentencing process by cunningly exaggerating his psychological symptoms through the practice of malingering.  In light of Defendant's possible mental health issues, the United States does not object to a sentence slightly lower than that called for by the United States Sentencing Guidelines (U.S.S.G.) in order to fashion a sentence that accounts for the specific characteristics of Defendant.  Rather than the 20 years of incarceration called for by the U.S.S.G., the United States recommends a term of imprisonment of 17 to 15 years, followed by a period of lifetime-supervised release.

In making this recommendation, the government understands that the Court may be contemplating a downward pursuant to U.S.S.G. § 5H1.3 based on Defendant's mental health.  Although the Court has this authority, it ought to be exercised sparingly in cases involving the possibility of violence.  *See generally United States v. Manns*, 690 Fed. Appx. 347 (6th Cir. 2017) (noting district court's authority); *United States v. Dixon*, 650 F.3d 1080, 1084 (8th Cir. 2011) (noting the authority and approving the district court's denial of a downward departure in a violent crime case); *United States v. Weir*, 587 Fed. Appx. 300 (6th Cir. 2014) (noting the concomitant authority of the district court to grant a variance and affirming the district court's decision to deny a variance in a violent crime case); T. Hutchinson, *et al.*, *Federal Sentencing Law and Practice* 1655-1657 (2016) (general discussion of the 2010 U.S.S.G. amendment allowing greater consideration of the defendant's mental state).  *But see Id.* at 1700-1703 (discussing the related and narrower authority to downwardly depart for diminished capacity, pursuant to U.S.S.G. § 5K2.13, and the prohibition on such departures in order to protect the public from a serious threat

of violence). Consequently, the two years of incarceration suggested by Defendant and limited supervised release period is wholly outside the realm of reasonableness.[1]

## II. Factual Background

In December of 2015, *before* defendant had contact with any Federal Bureau of Investigation (FBI) Undercover Employee (UCE), he connected with Abu Sa'eed Al-Britani ("Al-Britani"), whom Daniels knew to be an ISIS recruiter. According to Daniels, Al-Britani wanted him to make hijrah and participate in jihad.[2] *See* Exhibit 1, at 4. Al-Britani then passed Daniels to Abu Isa Al-Amriki, AKA Abu Saad Al-Sudani ("Al-Amriki")[3], whom Daniels also knew to be a member of the Islamic State of Iraq and al-Sham (ISIS) and a recruiter for this designated foreign terrorist organization. *Id*.; *see also* Doc. 41. Daniels sought to show his worth to Al-Amriki by sending funds to support ISIS. *See* Exhibit 1, at 5. On or about January 29, 2016, again before Daniels had any contact with an FBI UCE, Daniels provided $250 to Al-Amriki, with whom Daniels was in communication. Doc. 41. At Al-Amriki's direction, Daniels sent the funds via Western Union to an intermediary of Al-Amriki in Beirut, Lebanon. *Id*. The transfer was sent from Daniels' Western Union account in the name of Harun Muhammad, and funded through Daniels' checking account debit card (which is in Daniels' own name). *Id*. Later in March, after the FBI began investigating Daniels, but without the FBI's knowledge at the time, he also sent $300 as well. Doc. 41.

In February of 2016, the FBI learned of Daniels identity during the aftermath of the Mohammed Barry attack at the Nazareth Restaurant and Deli in Columbus, Ohio. Daniels and

---

[1] Pursuant to a telephonic conference with the Court held on May 14, 2018, all parties agreed that Defendant's psychological condition may be discussed in open court and in publicly filed pleadings. *See generally United States v. Garcia-Robles,* 640 F.3d 159, 166-68 (6th Cir. 2011); 18 U.S.C. § 3553(c).
[2] The term "hijrah" is used by Islamic extremists to describe traveling for the purpose of fighting. The term "jihad" is used by Islamic extremists to mean fighting or perpetrating acts of violence against non-believers.
[3] On April 22, 2016, Al-Amriki was killed near Al-Bad, Syria.

3

Barry were coworkers at the time of the attack; subsequently, Daniels, using the alias Abu Yusuf, relayed news of the attack in an approving fashion to UCE1, whom Daniels believed to be in charge of operations in the West on behalf of ISIS. *See* Exhibit 2, at 27-28 (UCE1 communications)[4]; Exhibit 3, at 5 (Al-Amriki communications)[5]. Even before the Barry attack, Daniels expressed to UCE1 his desire to do both jihad ("i am requesting assistance in making hijrah so that I can do jihad fisabillAllah and gain shahadah inshAllah") and to commit an attack in the West ("I most definitely want to do an istihadi operation in Darl Harb").[6] Exhibit 2, at 2 and 6.

> Daniels communicated these same intentions to Al-Amriki, stating:
>
> I would like to carry out an istihadi attack in the west I would still like to hijrah so that I could do jihad on the battlefield and Allah swt knows best srry akhii I thought I would do that after I did jihad on the frontlines but I'm content with whatever Allah has planned for me inshAllah.
>
> Exhibit 3, at 5-6.

Daniels later confirmed with Al-Amriki that his "plans are to go to Libya insha Allah and support the cause of Allah if Allah wills it." *See* Exhibit 3, at 18.

In May of 2016, Daniels reaffirmed these plans with FBI UCE2, wherein Daniels asked if UCE2 would be willing to help him make hijrah. Exhibit 4, at 3 (UCE2 communications)[7]. Specifically, Daniels wanted "to go to Libya to help the brothers" and made this decision after hearing from Al-Amriki that "Asham was closed."[8] *See* Exhibit 1, at 4; Exhibit 4, at 13. Daniels understood and knew that the term "Asham" was a reference to Syria, portions of which are

---

[4] The text of Defendant's statements are in grey and white boxes.
[5] The text of Defendant's statements are in blue and white boxes.
[6] In Arabic, istishdad means martyrdom or suicide attack and Darl Harb is an Islamic term for countries that are not under Islamic rule.
[7] The text of Defendant's statements are in black and white boxes.
[8] Asham or sham is a reference to Syria, which Daniels understood at the time he used the term. *See* Doc. 41

controlled by ISIS. Doc. 41. Daniels further stated that he had been preparing himself both spiritually and physically for hijrah. Exhibit 4, at 4-5.

After being introduced to FBI UCE3 in late May of 2016, Daniels maintained his commitment to "supporting the case of Allah swt by help make his word the highest and that of the kafirs the lowet through the sayf through jihad."[9] Exhibit 5, at 4 (UCE3 communications)[10]. On June 2, 2016, Daniels explained to UCE3 that "originally after high school, [he] planned to go to schook in Madinah to study shariah but now so sole wish is to do jihad fisabillah to help make LailahaillaAllah the highest on earth and the word of the kufgar the lowest and help the khalifah and his mujahadeed help facilitate the expansion of the Allah swt sharia on this earth."[11] *Id*. at 11. The following day, UCE3 asked Daniels why he wanted to go overseas and what group he wanted to join. *Id*. at 13-16. Daniels reiterated that originally he wanted to go "to Asham to support the cause of Allah," but had heard that it was "closed." *Id*. at 13. Daniels then said that "brother Abu Isa told me it was closed at the time…and suggested that I go to Libya their [sic] to support Allah's jihad and Khilafah." *Id*. at 13; Doc. 41. Daniels admitted that "Abu Isa" is Al-Amriki, and "Khilafah" is a reference to the "caliphate," which ISIS purports to have established. Doc. 41. On or about June 15, 2016, Daniels stated that he wanted UCE3's assistance to help him go to "waliyat baraqah so I could support the jihad there." Exhibit 5, at 18. Daniels admitted that "waliyat baraqah" is a reference to ISIS controlled territory. Doc. 41.

In or around October or November of 2016, Daniels again reached out to Al-Britani and indicated that he was "planning to go to Trinidad before I made hijrah to Libya do you know any masjids down there that have bros that could help accodomate me on my hijrah." *See* Exhibit 6.

---

[9] "Kafirs" refers to non-believers. "Sayf" is the Arabic word for sword.
[10] The text of Defendant's statements are in black and white boxes.
[11] "Khalifah" is a reference to the "caliphate," which ISIS purports to have established. In this context "Caliphate" is used to refer to ISIS's self-proclaimed system of religious governance.

At least during this same period, Daniels also possessed a document titled "Advice to Those Who Cannot Come to Shām" written by well-known Jihadist fighter, Al-Britani (*Advice*). *See* Exhibit 7. Chapter 3 recommends a person "try going to another country which is under the Caliphate like Libya…or anywhere else where there is jihad." *Id*. at 5. Chapter 4 indicates that if you cannot travel, then a person can support the Mujāhidīn with one's wealth.[12] *Id*. at 7. It advises that "brothers who may be being watched by the authorities have sent money to Shām via a middle man in a third world country who are known to the brothers here in Shām." *Id*. The document contains a footnote directing serious donors who do not have contacts in Sham, but wish to contribute, to contact Abu Isa Amriki, which is precisely what the defendant did before he had contact with the an FBI UCE. *Id*. at fn. 3. Moreover, the *Advice* recommended that those needing to gain the trust of brothers on the inside, or tazkiyah, the easiest way for a brother "to prove himself sincere is to give financial aid to the Mujāhidīn." *Id*. at 9. Again, this is exactly what Daniels did.

Daniels and UCE3 also discussed Daniels' travel plans for hijrah. For example, on or about November 1, 2016, UCE3 inquired as to why Daniels wanted to travel to Trinidad and how did it fit into Daniels' plan. Exhibit 5, at 64. Daniels responded the following day that he "wanted to go their [sic] so the kuffar don't track me as if I was to just to Tunisia from the united states." *Id*. Daniels admitted that the term "kuffar" translates to "non-believer" and that, in this context, Daniels was referring to U.S. law enforcement. Doc. 41.

On November 5, 2016, Daniels purchased an airline ticket to travel on United Airlines Flight Number 4402 from Columbus, Ohio to Houston, Texas. Doc. 41. Daniels was then scheduled and ticketed to depart Houston, Texas for Port of Spain, Trinidad and Tobago via United

---

[12] Mujāhidīn refers to fighters engaged in violent jihad; that is, acts of physical violence, including murder and maiming.

6

Airlines Flight Number 1457. *Id*. These flights were scheduled to depart on Monday, November 7, 2016. *Id*. No one in Daniels' family knew of his plans to travel; this included any relatives in Trinidad. Exhibit 1, at 6-7. In fact, Daniels did not even know where his family in Trinidad lived. *Id*. at 7. On November 7, 2016, Daniels arrived at the airport in Columbus, Ohio, which is within the Southern District of Ohio, and was arrested before boarding his outbound flight. Doc. 41. Daniels walked approximately five miles from his home to the airport before taking an airport shuttle from long-term parking. Subsequent to his arrest, and after having been advised of his *Miranda*[13] rights, Daniels admitted to the FBI that his ultimate destination was Libya and that he intended to travel there for the purpose of joining ISIS. Doc. 41. Daniels further admitted to sending the $250.00 and $300.00 via Western Union to Al-Amriki through an intermediary. *Id*.

In addition to the *Advice* document on Daniels' laptop, a search of Daniels' phone also revealed a copy of *Dabiq* magazine, ISIS' first propaganda magazine that included, among other articles, a feature on the beheading of Steven Sotloff, and a document regarding ISIS governance. Daniels' phone also included several photographs, taken by Daniels, of himself dressed in black holding up his right index finger, which is commonly associated with ISIS militants as well as photographs of Daniels displaying a knife. *See* Exhibits 8 and 9.

**III. Procedural History**

On November 10, 2016, a federal grand jury returned a two-count Indictment charging Defendant with providing and attempting to provide material support to a designated foreign terrorist organization, namely ISIL, in violation of 18 U.S.C. § 2339B. On July 7, 2017, Daniels pleaded guilty to Count Two of the Indictment, which specifically charged attempting to provide himself, as personnel, to ISL, pursuant to a Rule 11(c)(1)(A) Plea Agreement.

---

[13] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**IV. Sentencing Guidelines Calculation**

    a. <u>Statutory Maximum Sentence</u>

The maximum sentence for attempting to provide material support to a designated foreign terrorist organization is 20 years' imprisonment, a $250,000 fine, lifetime period of supervised release, and a $100 special assessment.

    b. <u>Sentencing Guidelines Calculation</u>

In imposing sentence, the Court must take into account the considerations of sentencing set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). As the Presentence Investigation Report ("PSR") correctly calculates:

- the base offense level is **26**, pursuant to U.S.S.G. § 2M5.3(a);

- there is a **2**-level increase because the offense involved the provision of funds or other material support, such as personnel, with the intent, knowledge or reason to believe they are to be used to commit or assist in the commission of a violent act, pursuant to U.S.S.G. § 2M5.3(b)(1)(E);

- there is a **12**-level increase pursuant to U.S.S.G. § 3A1.4(a) because the felony offense involved, or was intended to promote, a federal crime of terrorism; and

- there is a **3**-level decrease for acceptance of responsibility under U.S.S.G. 3E1.1(a) and (b).

Per the PSR's calculation, the total adjusted offense level is **37**; at a Criminal History Category VI[14], the guideline range is 360 months to life. However, the statutory maximum caps the guideline range at 240 months. U.S.S.G. § 5G1.1(c)(1). The Probation Officer recommends a sentence of 240 months, or 20 years, followed by ten years of supervised release.

      c.      <u>U.S.S.G. § 5H1.3 – Mental and Emotional Conditions</u>

On April 2, 2018, this Court provided notice to all parties that it was considering a downward departure pursuant to U.S.S.G. § 5H1.3 based on Defendants mental health. Even after two separate psychological evaluations, the government submits that the nature and extent of Defendant's mental state remains unclear because of the flawed reports of both Psychologists that in effect ignored the import of Defendant's clear efforts to deceive by malingering or exaggerating his symptoms. Both Psychologists recognize that the initial test results showed Defendant was malingering. For example, Dr. Davis noted that the test results administered by him showed that Defendant "was likely feigning the current symptoms of mental disorder." (Davis report at 15.) Thereafter, Dr. Davis met with Defendant and discussed with him the test results that showed he was "feigning," that is lying. Dr. Davis then administered tests after Defendant was aware that the results showed he was malingering. (Davis report at 16). So, now on notice of the fact that his prior responses demonstrated malingering, Defendant was permitted to engage in further testing to determine if he truly had a mental illness; perhaps to no one's surprise, Defendant "passed" the next set of tests, which suggested the presence of a mental illness.

As noted in the attached letter by Dr. Scott Bressler, Ph.D., the Clinical Director of the Division of Forensic Psychiatry at the University of Cincinnati, the process engaged in by Dr. Davis as described above "calls into question the validity and reliability of the test findings" and

---

[14] Since the offense involved a federal crime of terrorism, the criminal history category is VI, pursuant to U.S.S.G. § 3A1.4(b).

9

perhaps by extension their conclusions. Exhibit 10, at 1. Although glossed over with little analysis, the psychological report prepared by Dr. Predmore also recognizes that Defendant could very well have learned to lie better following Dr. Davis' discussion with Defendant about his lying. "It is a possibility that the examinee, *aware of the results of the first examination*, provided responses which did not raise concerns about feigning. However, it should be noted that malingering and genuine mental illness are not exclusive." (Predmore report at 11, emphasis supplied). The highlighted language shows that Dr. Predmore recognized the same problem with the testing protocol pointed out by Dr. Bressler. Moreover, as with the fruit of the poisonous tree doctrine in law, the decision of Dr. Davis to tell Defendant that he was lying, may have so infected the testing process that we will never be able to determine the truth. However, as noted above, the government, recognizing the Court's authority under Section 5H1.3 and based on the information developed in this case, urges that the Court to impose a period of incarceration from 17 years to no less than 15 years. This would be the appropriate sentence for Defendant in light of all the information now before the Court.

Moreover, a period of lifetime-supervised release is called for in this case. Lifetime supervised release is needed in order to adequately protect the public from this ISIS supporter, whose true intent can be discerned from his fighting photographic self-portrait holding a knife. While the government earnestly hopes that Defendant will be rehabilitated and renounce his commitment to wage violent jihad, and will receive any needed mental health care, the possibility of his permanent rehabilitation will be enhanced by a requirement of lifetime-supervised release where his conduct and treatment can be closely monitored. In making these recommendations, the government is intentionally considering all the matters before the Court, some of which are under

seal, and in light of its solemn duty to see that the Defendant is appropriately punished and the public is protected from danger.

### IV.    Determining the Proper Sentence

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

In this case, the sentence imposed must reflect the seriousness of Defendant's conduct, deter Defendant and others from committing future crimes and traveling to join ISIS, and promote respect for the law. The recommended sentence of between 17 and 15 years of imprisonment accounts for these factors as well as Defendant's history and characteristics and need for any further mental health treatment.

*Nature and Circumstances of the Case.*

The nature and circumstances of this case are undeniably serious. Daniels stands convicted of attempting to provide himself as material support to ISIS, one of the most dangerous and violent terrorist organizations. Moreover, Daniels admits to sending money on two separate occasions to support ISIS and show his worth and commitment to ISIS recruiters. Even before the FBI began its investigation, Daniels had reached out to ISIS recruiters and conveyed his desire to support ISIS by making hijrah for the purpose of jihad or committing an attack in the West. For nearly a year that the FBI is aware of, Daniels persisted in his support of ISIS – regardless of the number of opportunities presented by various FBI UCEs to disavow his commitment to their cause. Even near the end, Daniels again reached out to Al-Britani, a known ISIS recruiter, for assistance in his travel for hijrah, following his guidance by the book in choosing Libya as his final destination and sending money through an intermediary to earn the trust of insiders. Daniels' own photographs, dressed in black and holding up his right index figure, bear witness to his commitment to ISIS. Save for his arrest at the airport, Daniels would have been on his way to achieving his desire to support and serve ISIS.

### *History and Characteristics of the Defendant.*

Certainly, the Court must also consider the history and characteristics of Defendant. However, this factor does not detract from the need to impose a significant sentence of imprisonment. Daniels, who was raised by his mother in a happy home, is a high school graduate and maintained employment in labor related positions. Defendant asserts that he is suffering from schizoaffective disorder and that because of this disorder, argues that the Court should drastically depart from the 20 year sentence required by the U.S.S.G. and sentence him to a mere two years of incarceration—a stunning 90% reduction to the Guideline sentence. Doc. 85, at 19. This recommendation flies in the face of both the unique danger posed by terrorism, *United States v.*

*Meskini*, 319 F.3d at 92, and the principle that a reduced sentence based on a defendant's mental illness should be undertaken sparingly if at all. *See generally United States v. Dixon*, 650 F.3d at 1084 (noting the authority and approving the district court's denial of a downward departure in a violent crime case); *United States v. Weir*, 587 Fed. Appx. 300 (6th Cir. 2014) (noting the concomitant authority of the district court to grant a variance and affirming the district court's decision to deny a variance in a violent crime case).

Moreover, as the Court considers what role mental illness played in this offense, it is important to remember that Defendant had sufficient clarity of mind to lie to law enforcement officers in order to deflect attention from himself when necessary and deceive them about his true intentions. As noted above, Defendant was a co-worker of Barry, whose attack at the restaurant was, in part, investigated by the FBI. As part of that investigation, Defendant was interviewed and advised that false statements to law enforcement could result in prosecution. Exhibit 11, at 1. Nevertheless, during that interview, Daniels told law enforcement officers that he had been encouraged by Barry to listen to Shaikh Al-Faisal, whom Daniels acknowledged is an ISIS supporter, but that he never did listen. *Id*. at 2. When in truth, as Defendant later admitted, he had studied Al-Faisal and sent him an email. Exhibit 1, at 6. Daniels' efforts to distance himself from Al-Faisal were calculated given that during this same time period, he was communicating with Al-Amriki and UCE1, as described above, about his own desires to support ISIS. After his arrest at the airport, Daniels again lied to law enforcement when he initially denied (1) having any aliases or nicknames, (2) the use of email addresses or social media accounts in other names, (3) ever hearing the name Al-Britani, and (4) having more than one unsolicited contact with Al-Amriki.

Given Defendant's cunning attempts to manipulate others, it may be impossible to ever know the true psychological state of Defendant at the time of the offense or to what extent any

13

mental illness that he may have been suffering under actually impacted the offense conduct. In fact, the government does not dispute the general conclusion that Defendant was suffering from some mental problems, but as concluded by Dr. Davis these problems ". . . did not cause his actions." (Davis report at 22). Any departure under Section 5H1.3 should reflect that Defendant supported violent jihad before he encountered any government agent. Finally, although it is true that many persons have been radicalized by on-line terrorist propaganda, Defendant was not so mentally impaired that the propaganda caused his crimes. In fact, Defendant himself is an expert manipulator—he not only lied about the extent of his mental symptoms, but he lied to law enforcement about his own criminal actions. In both instances, the lies were calculated to manipulate others and to benefit himself. This is indicative of both the clarity of Defendant's mind and the danger such a manipulative mind poses to others.

Considering Defendant's ability to manipulate others and his commitment to one of the most pernicious terrorist organizations in modern history, the government urges the Court to impose a 17-year period of incarceration – or at the very least, a sentence of 15 years. Moreover, the possible mental illness of Defendant militates in favor of a lifetime-supervised release so that his mental issues may be addressed under court supervision and the danger to the public posed by this ISIS supporter may be somewhat ameliorated after his release from incarceration.

***Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment; The Need to Avoid Unwarranted Sentencing Disparities.***

The seriousness of this offense cannot be disputed; it is before the world almost every day as is evident to even the casual observer of the current international and national carnage flowing forth from those committed to the death culture worshiped by ISIS and its supporters. Consequently, imprisonment satisfies the need for the sentence imposed to reflect the seriousness

of the offense, to promote respect for the law, and to provide just punishment for the offense. Moreover the government's recommendation of 17 years to 15 years of incarceration reflects its best judgement concerning the history and characteristics of the person standing before this Court to be judged.

Defendant, however, argues that sentences in other terrorism cases suggest that a significantly below Guidelines sentence would be in order. Doc. 85, at 4-10. In his sentencing memorandum, Defendant cites to selected sentences from different cases around the country as purported "comparables" for the Court to consider in fashioning a sentence. That is not how 18 U.S.C. § 3553(a) works, and this approach contravenes the fundamental principles of Sentencing Guidelines, which were instituted, in part, to ensure uniformity of sentences and hence overall fairness. Moreover, the Court does not have the benefit of the Presentence Reports (PSRs) for these cases, so we do not know all of the factors that may have influenced the decisions. For example, the sentences in some of the cases cited by Defendant may well reflect cooperation provided by the defendant that remains under seal. In addition, as is well known, there are other factors that affect sentences such as litigation risks and a myriad of other factors. For these reasons, the use of comparable sentences by Defendant, although seemingly attractive, is actually a siren's song that is dangerous to true justice.

Nevertheless, the United States will undertake to show that the sentence recommend by the government in this case is well within the heartland of terrorism prosecutions of persons who attempted to travel to fight with a terrorist organization, commonly called "traveler cases." In this respect, the government notes that the maximum sentence allowed for material support to terrorism prosecutions was recently increased from 15 years of incarceration to 20 years of incarceration by Public Law 114-23, Title VII, § 704, June 2, 2015, 129 Stat. 300. As noted above, the statutory maximum sentence controls since the Guidelines technically call for 30 years of incarceration.

The table set out below involves traveler prosecutions pursuant to a guilty plea; thus, unlike the cases cited by the defense, all the below cases involve facts similar to those now before the Court. Courts have regularly and routinely sentenced similarly situated defendants to the statutory maximum sentence as required by the U.S.S.G.  The Court will note that the majority of the cases relied on by both Defendant and the United States involved conduct that occurred before June 2, 2015, and thus the maximum sentence for a single count of 18 U.S.C. § 2339B was 15 years or 180 months.  Some of the cases cited below that pre-date June 2105, however, involve guilty pleas to more than one count, with a resulting sentence above 15 years of imprisonment.

| CASE | CHARGE DATE | CONVICTION DATE | CONVICTION CHARGE | SENTENCING DATE | SENTENCE |
|---|---|---|---|---|---|
| *United States v. Shelton Thomas Bell* CR 13-00141(TJC) (MDFL) | 7/18/2013 | 3/19/2014 | 18 U.S.C. § 2339A | 1/14/2015 | 240 months' imprisonment; lifetime supervised release; $17,000 restitution |
| *United States v. Mufid Elfgeeh* CR 14-06147(EAW) (WDNY) | 9/16/2014 | 12/17/2015 | 18 U.S.C. § 2339B | 3/22/2016 | 270 months' imprisonment 330 months' supervised release |
| *United States v. Adam Dandach* CR 14-00109(JVS) (CDCA) | 7/16/2014 | 8/10/2015 | 18 U.S.C. § 2339B; 18 U.S.C. § 1542 | 7/25/2016 | 180 months' imprisonment (count one), 120 months' imprisonment (count two), concurrently; lifetime supervised release |
| *United States v. Hamza Naj Ahmed* CR 15-00049(MJD) (DMN) | 2/4/2015 | 4/25/2016 | 18 U.S.C. § 2339B; 20 U.S.C. § 1097 | 11/15/2016 | 180 months' imprisonment; 240 months' supervised release |

16

| CASE | CHARGE DATE | CONVICTION DATE | CONVICTION CHARGE | SENTENCING DATE | SENTENCE |
|---|---|---|---|---|---|
| *United States v. Abdulrasul Juraboev a/k/a Abdulloh Ibn Hasan* CR 15-00095(WFK) (EDNY) | 3/9/2015 | 8/14/2015 | 18 U.S.C. § 2339B | 10/27/2017 | 180 months' imprisonment; deportation upon completion of sentence |
| *United States v. Akhor Saidakhmetov* CR 15-00095(WFK) (EDNY) | 2/24/2015 | 1/19/2017 | 18 U.S.C. § 2339B(a)(1) | 12/20/2017 | 180 months' imprisonment; deportation upon completion of sentence |
| *United States v. Leon Nathan Davis a/k/a Abdul Wakil Khalil* CR 15-00059(JRH) (SDGA) | 2/5/2015 | 5/27/2015 | 18 U.S.C. § 2339B | 7/28/2015 | 180 months' imprisonment; lifetime supervised release |
| *United States v. Emanuel Lutchman* CR 16-06071(FPG) (WDNY) | 12/30/2015 | 8/11/2016 | 18 U.S.C. § 2339B(a)(1) | 1/26/2017 | 240 months' imprisonment; 600 months' supervised release |
| *United States v. Omar Faraj Saeed Al Hardan* CR 16-00003(LNH) (SDTX) | 1/6/2016 | 10/17/2016 | 18 U.S.C. § 2339B | 12/18/2017 | 192 months' imprisonment' lifetime supervised release |

Moreover, Defendant is not an ordinary traveler. In addition to attempting to travel and fight for ISIS, Defendant, on his own accord and before encountering a government agent, sent

17

funds to support ISIS. This fact also supports the need for the 17 to 15 year sentence recommended by the government in this prosecution. The recommendation for lifetime-supervised release is consistent with the supervised release period imposed in the above-cited cases.

### *Afford Adequate Deterrence to Criminal Conduct and Protection of the Public.*

The Court must also consider the need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from this Defendant. Here, the Government respectfully submits that the recommended term of imprisonment as well as term of supervised release is necessary to serve these purposes. As noted above, the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d at 92. Many of the recommended conditions of supervised release, such as monitoring electronic devices and social media accounts as well as periodic polygraph examinations, will also help to ensure the public is protected from any future crimes of Defendant. Moreover, the defendant's likely need for continued psychological treatment would be more easily attended to by the court's continued supervision of the defendant. A lengthy period of supervised release is needed to both protect the public and ensure the defendant's compliance with any on-going medical treatment.

### *The Need to Provide Defendant With Training, Medical Care or Other Treatment.*

As recommended in the PSR, Daniels should be designated to an institution that will provide him with comprehensive mental health counseling and treatment while incarcerated and such treatment should continue upon release for the entirety of his time under supervision, which

the Government strongly urges should be for his entire life in order to properly protect the public and to facilitate the Defendant's own permanent rehabilitation.

**V. Conclusion**

For the reasons set forth above, the United States respectfully recommends that Defendant Aaron T. Daniels be sentenced to serve a term of imprisonment of 17 years, but in no event less than 15 years, followed by a lifetime period of supervised release. The government submits that this sentence is sufficient but not greater than necessary to satisfy the statutory purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney


*s/Jessica W. Knight*
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney
JOSEPH M. GIBSON (0084587)
Special Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 469-5715


MICHAEL J. DITTOE (IL 6191470)
Trial Attorney, U.S. Dept. of Justice
950 Penn Ave., N.W.
Washington, D.C., 20530
Phone: (202) 307-3804

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Government's Sentencing Memorandum* was electronically served via the Court's CM/ECF system this 29th day of May, 2018 upon Counsel for Defendant Aaron T. Daniels.

> *s/Jessica W. Knight*
> JESSICA W. KNIGHT (0086615)
> Assistant United States Attorney